As I announced at the beginning of court yesterday, Judge Stapleton and I continue to be grateful today to Judge Arthur Allercon of the Ninth Circuit Court of Appeals for assisting us with our cases. Judge Allercon sat in Wilmington with cases last week and is here this week with us and we appreciate it very much. We'll proceed with our cases for argument this morning. First case is Diaz v. Commissioner. Good morning. May it please the court, my name is Abraham Alter and I represent the appellant in this matter, Maria Diaz. I ask for three minutes rebuttal time if that is granted. Thank you very much. This case involves two major errors by the Administrative Law Judge. The first being and probably the most important is the consideration of obesity. A little history may be enlightening. Obesity used to be an impairment that was recognized as a presumptively disabling impairment if the obesity reached a certain level. That listing was called 10.10, later 9.09 and it basically said that if one has a certain height and a certain weight and a certain other impairment which is likely to be exacerbated by that level of obesity, such as cardiovascular disease or arthritis or a weight-bearing joint, that person, if they met the basics, 4'11", 252 pounds, they are presumptively disabled. The Commissioner eliminated that listing and obviously the Commissioner which creates the listings has the authority to kill a listing. Is that, I'm looking at the SSR, I think it's dated 2000, is that what happened? Yes, they took the listing out and they gave us the SSR. And later that SSR was revised 0.3, but it's exactly the same in tone and in content. The interesting thing is that the Commissioner did not have the right, or at least they thought they didn't have the right, but for the last 20 years being 600 pounds was disabling, now we say it isn't. No, they wouldn't say that and they didn't say that. What they said was it's too arbitrary. There are people 5 pounds off who may be disabled who are not getting disability and there may be people who can work who are 5 pounds over who are getting disability. Why don't we stop being arbitrary by drawing a line and why don't we issue a ruling telling every adjudicator how to evaluate obesity? And that's the listing that Judge Rendell referred to and it's in my brief and it's in my colleague's brief. And basically at every level of the sequential evaluation, levels 3, 4, and 5, the adjudicator, in this case the ALJ, must evaluate obesity. Well it's clear that the ALJ was aware of the obesity and mentions it in fact in the findings of fact. Which is why I say. And the district court says certainly, although not stated specifically, certainly the ALJ considered it. What's wrong with that reasoning? It's like me telling your honor I'm considering paying taxes next year as long as I don't really have to do it. How do you know we considered it, Judge? How do we know we considered it? Consider it means that we get the benefit, we the readers of an administrative decision, get the benefit of a discussion, an analysis, and a conclusion. So it's A42 and 43 when there's diabetes, hypertensive, pulmonary, etc. There had to have been a specific discussion of how obesity bears on each of these things? Correct. The ALJ has the first move and he made the first move correctly. In other words, at step two it's the ALJ who says that her obesity is a severe impairment. Now had he not found that I would be here with a different brief. But he did find that. Once he finds that he triggers for himself through the ruling a certain protocol. Now the protocol doesn't have to meet any specific ledger of checkoffs. However, it is beyond doubt that the decision does not in any way, shape, or form mention or consider or analyze obesity at steps three, four, and five. When you get from the ruling the requirement that it must be discussed, not just acknowledged. It was in my brief, Your Honor. I mean it says an assessment should be made of the effect it has on the ability to perform routine movement, necessary physical activity. We have three doctors who examined her and found no movement. She got up and off the examining table fine. She couldn't squat as well. But other than that we don't have any functional limitations. Well yes, he said because of this she's limited to sedentary employment. I mean she couldn't stand on her feet all day. Dr. Noor said that she was terrifically compromised by her body habitus. But even having not said that, if Your Honor says to me, listen, I don't see any doctor in this record that says anything about obesity. I would counter with a very simple question. I don't ask court questions, but I'm asking the SCIA question. Why did ALJ find obesity to be severe? When you find an impairment severe, you are saying something. And what you are saying is it has an impact on your ability to do basic work-related functions. And it's a very low threshold, we have said. Correct, especially in this circuit. It's a very low threshold, more than slight, under Allen and McCray, I believe. But the point of the matter is the ALJ concedes that she has obesity, which means the obesity creates a more than slight or significant restriction in her ability to do certain basic work-related functions. He never tells us what they are. He tells us she can do sedentary work. He doesn't even define sedentary work. But we know what it is. Regulations define sedentary work. You have to sit six hours, you can stand and walk two hours in an eight-hour workday, lift ten pounds. We understand that. But the fact of the matter is she's limited to sedentary work by her means. What is her obesity? What restrictions does her obesity give her? The ruling says A, you have to consider obesity at every step, and B, sometimes obesity can meet the listings in combination with another impairment. Sometimes obesity can cloud your thought processes, make you mentally tired. Fatigue is a big part of it. Are you telling us that an ALJ has to go down the list of listings, in his opinion, and say, listing number one, she doesn't have, and obesity doesn't put her over the top of this one. Number two, obesity doesn't put her over the top of this one. Well, what is it that you say he's got to say? We're talking step three now, listings that are per se disability. What is the standard? What's he supposed to do? What did he didn't do here? What would he have said? This court under Jones said there is no format. So I can't say that there's a format. What I can say is the following. He said she has a severe problem with her knees, and she doesn't meet 103A. At that point, the ruling says, he has to say, and her obesity, which causes this restriction, does not exacerbate her non-listing level weight-bearing arthritis to the point where it is listing level because A and B and C. So he should have done that, and I'm looking at A43, which would be page five of nine. I guess it's 42 and 43. When he goes down diabetes, hypertension, pulmonary, spine, joint, each one of those, he should say, and oh, by the way, the obesity doesn't put her over the top. Well, because the obesity ruling says that you can equal the listings if you have arthritis in a weight-bearing joint and obesity. You can equal the listings if you have a respiratory impairment and obesity. You can meet the listings. He said in each instance, this listing is not met, and he's looking at a lady who's 4'11 and 254 pounds, whom he has found to have severe obesity. What does he do with the severe obesity? He's got to do something with it. It's not enough to just say she has a severe obesity. I can't argue that. She's 4'11, 252. It says here in the ruling, we will also find the listing is met if there is an impairment that in combination with obesity meets the requirements of a listing. For example, obesity may increase the severity of a coexisting or related impairment to the extent that the combination meets the requirement. Where is that in the decision? Answer, nowhere. The district court says he didn't do it, but it's okay. My colleague says he didn't do it, but it's okay. I say it's not okay because the commissioner issued this ruling. Don't forget, I know this is completely irrelevant, but that's the way I argue, as you know. Listing 10.10 and listing 9.09, if you're 4'11 and you're 232, you win. If you can show arthritis in your knees, which you know she has. They took that listing away, okay? But they didn't take it away because it's no longer relevant that you have bad knees and you're obese. She's 20 pounds over morbid obesity listing level. They took it away and gave us a better way to look at obesity. So you'd look at it without a rote chart you have to consider. What do we do with the fact that at age 45 there's no doubt that she has disability? Isn't that right in this? Yes, but the ALJ gave her disability at age 45. Right, exactly. I never argue when I win. No, I know that, but I mean... She's not, again, there was a, I didn't argue this at the district court, and I put it in a footnote, but since your honor asked, he's not allowed, or at least he shouldn't, just make it, make the age requirement a, you know, knee-jerk reaction. She was exactly the same before the morning of her 45th birthday. He's allowed to go back three months, sometimes even six months, to say she was exactly the you know, as you would age 21 for drinking. But don't we look at, doesn't the ALJ look at impairments in terms of how they affect the mental or physical functionality? And here we do have three doctors who seem to say that, I mean, you would normally think if someone's obese and it did affect that they would have shortness of breath, that they would have trouble getting up and off the examining table, et cetera, et cetera, and we don't see that here. Well... So does it matter? Well, it doesn't matter in this particular case. First of all, getting on and off the examining table is not working eight hours, number one. Number two, the ALJ's decision really trumpets Dr. Tierston, a social security examiner, and if you look at 386 in the transcript, Dr. Tierston is one of those doctors which didn't find crepitus in the knees, he didn't find anything. He's an orthopedist. At 384 it says orthopedic examination. I'm assuming he's an orthopedist, but gee, I hope he is. I realize your light is on. May I finish the sentence? Finish the sentence. If you look at 386, diagnoses, this is an orthopedic diagnosis. He doesn't say one word about any orthopedic problem. Here's a man who we are saying is an orthopedist who examined her for her orthopedic problem, a problem that the ALJ admits exists. She has severe arthritis in her knees. That was the ALJ's finding. He doesn't find there's anything wrong with her knees. His diagnosis is severe obesity, non-insulin dependent diabetes, hypertension, back and chest pain, hypercholesterolemia, she's high cholesterol, and bronchial asthma. He doesn't even find there's anything wrong with her knees. How's that possible? All right. We will hear from you on rebuttal. Thank you. May it please the court. Carla Guinn, Special Assistant U.S. Attorney for the Commissioner of Social Security. Your Honors, contrary to appellant's assertion, the ALJ properly analyzed Ms. Diaz's obesity at all steps of the sequential evaluation process, and that's clear from his decision. The district court said that it's not discussed, but he obviously considered it. How do we know that? Well, Your Honor, he considered obesity at step three, the listings step, because he said plainly in his decision that he considered all of Ms. Diaz's impairments in determining that non-meta listing singly or in combination. He also relied plainly on medical expert Dr. Fetchner, who, after reviewing the entire record, including all the findings about Ms. Diaz's obesity, stated that none of her impairments met any listed impairment singly or in combination. Did Fetchner consider obesity? Yes. Well, he considered all of her impairments, and he reviewed all of the evidence of record. Well, he really talked about the arthritis. He really didn't talk about the obesity. Well, again, the new regulations require that we consider the effects of obesity when you evaluate disability and how the obesity can affect other impairments, such as knees and arthritis and standing and things like that. So when you're considering such things as arthritis and inability to stand and inability to be on your feet, you're considering the effects of the obesity at that stage. And so he considered all of that. But he doesn't, as the district court points out, the ALG did not use the, he says the magic word, obesity. Well, exactly, but you're not required to, as this court has found in Sassone, there are no magic words when it comes to discussing obesity. But when in the ruling it says consider and assess, I just don't see the reasoning process here when the ALJ goes through, I mean, every other type of impairment here would seem, just from a common sense standpoint, to be exacerbated. I mean, talk about asthma and hypertension. Right, and that's why we have to view, where obesity is really somebody's weight, we're medically affects that person's other existing impairments. Exactly. Such as her arthritis. And so the ALJ, in considering all of the medical evidence of record, and same as Dr. Fechner, the medical expert, they were considering all of the physician's opinions who noted Ms. Diaz's height and weight, and even at times noted that she had severe obesity or was obese, and then went on to note that she was able to move freely, move normally, had normal range of motion, didn't have – For a five-minute examination. Not always five. I mean, some of these were her treating physicians, so it wasn't necessarily a five-minute. Some of them was over a course of time. Indeed, there are at least three – Dr. Merlin noted her height and weight, and yet found that she had normal gait, station, and could sit, stand, and walk without limitation. Dr. Potashnik noted her height and weight, yet found that she had full range of motion of the knee, spine, and could heel and toe walk. Dr. Tierson, as Appellant's counsel mentioned, noted that she had severe obesity, yet had full range of motion of the hips, knees, and ankles. Dr. McHale noted that she had obesity, yet found that she would still be able to perform light work. And the medical expert at the hearing noted that she had impairments, including obesity, yet would be able to perform sedentary work. So the ALJ is required to consider all of the medical evidence, which she did, and in considering her height and weight and her resultant obesity, had to consider how that affected all of her preexisting impairments. And – Now, it's not stated at – on the record here where the ALJ says he's going to consider the combination. There is no stated consideration. Should we send this back so the ALJ can clearly look at that? And I'm looking at number four. The claimant does not have an impairment or combination that meets or medically equals. And there is not any discussion of any combination here at all. They're all very discrete. I'm talking A42, 43 at the back of the blue brief. In the ALJ's decision. A42, A43. In the district court's decision? No. Blue brief. Oh, the appellant's brief. Blue. We call it blue. It's just easier to say than appellant. I'm sorry about that. That's all right. A42, the bottom of A42, where the announced statement at number four, the claimant does not have an impairment or combination that meets. Okay. Discussion. Diabetes, hypertension, pulmonary insufficiency, spine, joint. And there's no mention. So we can't tell – I'm sorry. I'm sorry. No, go ahead. Well, he comes right out and says that he has considered – does not have an impairment or combination of impairment. Right. But then afterwards he puts forth the supporting statements for that conclusion, correct? About all the different listings. Right. At the bottom of 43 to the top of 43. And there is no mention of obesity. That seems to be contrary to what he's supposed to do under the ruling. Should we send it back? Well, there is no obesity listing. You do consider obesity, like you're saying, at all of these points. And so how obesity affects – no, we should not send it back because we have a medical expert here who reviewed that also. Dr. Fechner said that after reviewing this and all of her impairments, she does not meet a listing singly or in combination. And he considered the obesity and he considered all of the physicians' opinions. And because all the doctors were aware of her obesity, you have to – as this court has held in Rutherford, we find that an ALJ's adoption of those conclusions constitutes a satisfactory, if indirect, consideration of that condition. So I think that's the important thing to note here. And the ALJ also properly considered the obesity at step five when he included in his hypothetical that Ms. Diaz was limited to sedentary work with no climbing, crawling, only occasional balancing, stooping, kneeling, crouching. He knew that she was limited in this way. MS. FECHNER Very often I have the distinct impression that we consider the work people can do, but not how in heaven's name they get up and get to work and get home and go through the day. I mean, certainly she could sit for, you know, and maybe stretch, et cetera, but she has so many impairments, it's difficult to imagine. MS. RAHMAN Well, she does have – she certainly does have severe impairments, but as the ALJ noted, the medical findings, as well as her own subjective statements – Ms. Diaz herself, you know, claimed that she only took Tylenol and Advil for pain. I mean, she wasn't taking prescribed painkillers. She wasn't seeking emergency room treatment for pain. She was able to do housework, cook, clean, go to church. I mean, she was leading an active life. There are – the medical evidence and the record as a whole certainly point to the fact that she wasn't as disabled as she alleged, or that she wasn't – excuse me, that she wasn't in as much pain as – MS. RAHMAN And yet, as a matter of law, at age 45, she's disabled. MS. RAHMAN As a matter of law, at age 45, she's found However, the ALJ was charged with reviewing – determining whether she was disabled beginning in 2000, when she was 40 years old, and the evidence of record did not demonstrate medical disability. And in fact, he also relied on vocational testimony to confirm that she was not disabled. MS. RAHMAN How about her severe adjustment disorder? There was testimony by the vocational expert that if she did lack the ability to concentrate, there would be no jobs in the economy. Was that properly assessed by the ALJ? MS. RAHMAN That was properly assessed. There simply wasn't evidence of record to show that she had such limitations. She really only had mild limitations of concentration, as the ALJ noted, and that was supported, one, by the state agency psychologist's functional capacity assessment. She found – Dr. Brennan, the state agency psychologist, found that Ms. Diaz could follow simple instructions, she could attend and concentrate, keep adequate pace and persist, and relate and adapt to tasks in the workforce. Also, another medical consultant, Dr. Gutierrez, found that Ms. Diaz could follow instructions, follow conversation, do math problems. She herself had her own statements that she could read and, again, do activities of daily living, never mentioning any impairment in concentration. And, in fact, she didn't have any psychological treatment, even discussions with her own primary care physicians about having lapses of concentration. So there's really nothing in the record to support such moderate lapses of concentration, and as a result, the ALJ did appropriately reject that testimony from the vocation. QUESTION Did the ALJ expressly reject that? MS. RAHMAN I believe – yes, he did, Your Honor. QUESTION And what did he say? MS. RAHMAN He said that – MS. RAHMAN I think it's in the middle of page 22.  RAHMAN Yeah. MS. RAHMAN It says, I've given careful consideration to the opinions of state agency medical consultant who assessed the claim as having a severe impairment and that she has a moderate difficulty in maintaining concentration, persistence and pace. MS. RAHMAN Yes. MS. RAHMAN But then, what's he say? QUESTION Did the ALJ, however, consider the impact of obesity on that? MS. RAHMAN The impact of obesity on her mental? QUESTION Yeah. MS. RAHMAN Well, again, in the same way that he did in the discussion in the beginning, the same way he considered it when you considered all of her impairments. And we would have to consider – he's charged with considering how obesity affects all of her impairments. MS. RAHMAN At the end of that very paragraph that I was alluding to, he says, giving the claim and every benefit of the doubt, I find her adjustment disorder to constitute a severe impairment. MS. RAHMAN Yes. He does find it a severe impairment. MS. RAHMAN Yet it doesn't analyze it at number four, where he goes through all of the impairments.  RAHMAN Doesn't analyze whether it meets the listing? I'm just confused. MS. RAHMAN Well, at number four. MS. RAHMAN He says the claimant does – and I'm assuming this conclusion is a conclusion that flows from what he then discusses. The claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments. So then he talks about diabetes, hypertensive, pulmonary. Talks about a few. He does not mention either the adjustment disorder or the obesity. MS. RAHMAN Well, with all due respect, when he discusses listing 12.04, he is discussing her mental limitations. Listing 12.04 is not met because – MS. RAHMAN Okay. Ability to maintain – MS. RAHMAN And that's what he's required to do and that's where he does that.  RAHMAN Okay. All right. Thank you. MS. RAHMAN So he does analyze their adjustment disorder and concludes that it does not meet a listing. And he considered her obesity as he did at all the other steps in conjunction. So as a result, he properly considered her obesity. He properly determined that she was not disabled prior to July 1, 2005. His decision is supported by ample medical evidence by her own subjective statements and by vocational testimony which show that she could indeed perform work which existed in significant numbers in the national economy. MS. RAHMAN Wouldn't a written opinion requiring the ALJ to do what your colleague suggests to set forth the reasons why obesity, for example, in combination with the others, would not entitle her to disability and make your job, his job, and our job easier? MS. RAHMAN For the ALJ to go through each? MR. RAHMAN Yeah. To summarize the impact of, for example, a severe impairment like obesity on the other conditions and indicate why that moves him out of Step 3 into Step 4. MS. MS. RAHMAN So the ALJ to do some medical decision making, which we're not asking him to do. I mean, we can't ask him to do. He's simply required. MR. RAHMAN But he has to rely on the medical experts. MS. RAHMAN Right.  RAHMAN He did indicate that he was.  RAHMAN Yeah. MR. RAHMAN But he didn't spell out. MS. RAHMAN Well, I think he did spell it. He spelled out perfectly clear in his decision that he was relying on the medical. MS. RAHMAN Speak into the microphone, please. MS. RAHMAN I'm sorry. That he was relying on a medical expert, Dr. Fetchner, to review all of the evidence of MS. RAHMAN And to review all of the doctor's findings who noted her obesity and noted that she still was able to function normally. And take that, as Rutherford says, take that indirect, I'm sorry, the satisfactory, if indirect, consideration of the condition in the review. MS. RAHMAN But didn't we say in Burnett, didn't we remand there and say the ALJ shall fully develop the record and explain his findings in Step 3, including an analysis of whether and why the ALJ should be removed?       MS. RAHMAN Okay. MS. RAHMAN Okay. MS. RAHMAN Okay. MS. RAHMAN Okay. MS. RAHMAN Okay. MS. PEREZ-FOX And you said they should employers natuurlijk umpire or those impairments combined are not equivalent. There we said we will not permit the ALJ to make a summary conclusion. MS. HOPKINS Absolutely, Your Honor. That is what Burnett said. But also in Sassone we were told that the ALJ does not need to use magic words when discussing obesity. It's a consideration and that's why the SSR 003P is so important. And it said we are moving away from the specific obesity listing and we are making it so that we are considering obesity at all steps. We are generally considering it at all steps. And yes, you have to document that consideration properly. But we have moved away from the specificity required from the listings. And so we don't need the magic words.  PEREZ-FOX You keep referring to Rutherford, but in Rutherford they never raised obesity before the ALJ, did they?  HOPKINS No, they didn't. But in fact in this case Ms. Diaz didn't discuss it as a limiting factor either. PEREZ-FOX Well, the ALJ found it was a severe impairment. MS. HOPKINS Yes.  But based on height and weight notations from doctors, no. PEREZ-FOX Okay. All right. Thank you. MS. HOPKINS You're welcome. PEREZ-FOX I was just going to ask about the standard of review. HOPKINS Okay. But let's pick up where we left off here because I'm still lost. We've got a case where the ALJ at step two says we have a 254-pound woman here who's 4'11 and she's got five or six severe problems, one of which is obesity. Then he immediately moves to step three and he says, my conclusion is the claimant does not have an impairment or combination of impairments, presumably all five or six of them, that medically equals one of the listings. And then he lists – he goes to each listing that could conceivably be relevant and there is no – you agree, there is no listing for obesity.  PEREZ-FOX Discussion of obesity. MS. HOPKINS Obesity listing. And he discusses each listing and he says in each case why it does not qualify. And then at the end he refers us to Dr. Fechner as his support for his conclusions. Now, for example, listing 1.02A says, pertaining to major – listing 1.02A, pertaining to not met because there is no evidence of an inability to ambulate effectively. Now, you're telling us that he has to say listing 1.02A, pertaining to a major dysfunction of a joint, despite her obesity, this listing is not met because there is no evidence of an inability to ambulate effectively. PEREZ-FOX I don't think just saying despite your obesity would really rise to the level. With all due respect, it's the Court's fault that he did this to begin with because the Court let everybody off the hook. Judge Rendell quoted Burnett, one of the great cases that was decided in terms of Social Security. Then the Court backtracked in Jones, which is why we have – and Sasone, which is why we have ALJs not combining all the listings together because the – this Court said there is no magic formula. So guess what? They have no formula at all. What he should have said is there's 1.02A she doesn't meet, there's 9.03 she doesn't meet, and she doesn't meet in combination because even though she misses this, she has this. In other words, if he says she can't ambulate effectively, she says she can't ambulate effectively and that obesity exacerbates that problem, okay? Well, that's what we have ALJs for. His medical expert said – it doesn't make a difference if his medical expert's there. He's a retired internist. He's there. But we do have three medical experts and the standard is substantial evidence, right? Yes, of course. And we have three experts who say she gets up and – We have Dr. Noor who says she has severe crepitus and severe arthritis. And the medical expert who was at the hearing said that means she has severe arthritis, moderate to severe, and that she has bone on bone. That's what crepitus means. Right. Now, you don't have to be a doctor. That's why we have ALJs. She has bone on bone in both knees and she weighs 252 pounds, but she can ambulate beautifully. Why? Because Dr. Tiersten, who said there's nothing wrong with her knees, saw her for five minutes and said, get off the examination table. You're fine. Is that substantial evidence? Well, we do have three doctors. We do have three doctors who don't refer to the crepitus, so maybe it places doubt on it. That's the point. If one MRI finds that I have a broken leg and two other MRIs find I have no broken leg, which one do you listen to? An MRI can't be wrong about a fracture. It can miss a fracture. A doctor can't be wrong about bone on bone crepitus. Some other doctor can miss it, but it can't be found unless it's there. We have an MRI, but not an X-ray that Fechner testifies. Exactly. An X-ray would be better for an arthritis, but she goes to a clinic, so she never takes it. And by the way, isn't it amazing that Social Security sent to the three doctors, the judge at Reddell, three doctors and not one of them took an X-ray? Here's a woman who complains of bad knees. Social Security paid for three doctors and not one took an X-ray. Is that substantial evidence? Can I have a little more time? Judge Hamilton, do you have any further questions? No, I'm content. I think we are... I didn't get a chance to rebut about the vocational expert, which is a very, very important part of the case. All right, we'll take it under advisement. Thank you. Thank you, Counselor. Thank you very much. The case is well argued. We'll take it under advisement. We'll call our next case, which is PB Brands v. Patel.